# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

ALICIA CHRISTINA PLASCENCIA,    )    NO. CV 18-3614-E
                                )
            Plaintiff,          )
                                )
       v.                       )    **MEMORANDUM OPINION**
                                )
NANCY A. BERRYHILL, DEPUTY       )    **AND ORDER OF REMAND**
COMMISSIONER FOR OPERATIONS,     )
SOCIAL SECURITY,                )
                                )
            Defendant.          )
_____)

    Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS
HEREBY ORDERED that Plaintiff's and Defendant's motions for summary
judgment are denied and this matter is remanded for further
administrative action consistent with this Opinion.


## PROCEEDINGS

    Plaintiff filed a complaint on April 30, 2018, seeking review of
the Commissioner's denial of benefits.  The parties filed a consent to
proceed before a United States Magistrate Judge on May 24, 2018.
Plaintiff filed a motion for summary judgment on August 28, 2018.

Defendant filed a motion for summary judgment (entitled a "Memorandum in Support of Defendant's Answer") on September 26, 2018.  The Court has taken both motions under submission without oral argument.  See L.R. 7-15; "Order," filed May 1, 2018.

**BACKGROUND**

Plaintiff asserts disability since August 3, 2011, based on a combination of alleged physical and mental impairments (Administrative Record ("A.R.") 32-51, 173-74, 182, 208, 234).  An Administrative Law Judge ("ALJ") reviewed the record and heard testimony from Plaintiff and a vocational expert (A.R. 15-24, 29-58).

The ALJ found that Plaintiff suffers from severe diabetes, diabetic neuropathy, bilateral carpal tunnel syndrome, bilateral tarsal tunnel syndrome, a history of congestive cardiomyopathy, obesity, a mood disorder (not otherwise specified) and generalized anxiety disorder.  See A.R. 17-18 (finding nonsevere Plaintiff's lumbar disc disease).  The ALJ found that Plaintiff retains the residual functional capacity for a range of light work, limited to: (1) occasionally climbing and balancing; (2) frequently stooping, kneeling, crawling and crouching; (3) frequently handling and fingering; (4) no concentrated exposure to fumes, odors, dusts, gasses, poor ventilation and hazards; and (5) simple repetitive tasks with only occasional contact with coworkers and the general public. See A.R. 19-22 (giving "significant weight" to internal medicine consultative examiner's opinion at A.R. 334-39 (finding Plaintiff capable of light work), "great weight" to state agency physicians'

opinions at A.R. 65-67 and 78-80 (also finding Plaintiff capable of light work), and "little weight" to the psychiatric consultative examiner's opinion at A.R. 325-30 (finding no psychiatric limits)). The ALJ concluded that Plaintiff was capable of working as an assembler of small products, inspector or marker (A.R. 23-24 (adopting vocational expert testimony at A.R. 52-54)).

In determining Plaintiff's residual functional capacity, the ALJ deemed Plaintiff's subjective complaints "not entirely consistent with the medical evidence and other evidence in the record" (A.R. 20). As detailed below, Plaintiff had reported and testified that her impairments cause limitations of allegedly disabling severity (A.R. 34-51, 193-96).

The Appeals Council denied review (A.R. 1-3).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards.  See Carmickle v. Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotations omitted); see Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006).

If the evidence can support either outcome, the court may
not substitute its judgment for that of the ALJ.  But the
Commissioner's decision cannot be affirmed simply by
isolating a specific quantum of supporting evidence.
Rather, a court must consider the record as a whole,
weighing both evidence that supports and evidence that
detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and
quotations omitted).

**DISCUSSION**

Plaintiff contends, <u>inter alia</u>, that the ALJ erred in evaluating
Plaintiff's statements and testimony concerning the severity of her
limitations.  <u>See</u> Plaintiff's Motion, pp. 7-10.  For the reasons
discussed below, the Court agrees.

**I.    <u>Summary of the Medical Record</u>**

After working for 18 years for the Department of Motor Vehicles,
Plaintiff stopped working on August 2, 2011, following an acute
illness for which she had been hospitalized (A.R. 235, 266-68, 325,
327, 488-524).

Dr. Geetha Gabbita had treated Plaintiff somewhat regularly from
at least August of 2010, when Plaintiff was still working, through
June of 2012 (A.R. 290-304).  Dr. Gabbita's treatment notes are

partially illegible.  In August of 2010, Plaintiff complained of abdominal pain and "eating everything," for which she wanted a lap band (A.R. 304).  Plaintiff's abdomen had minimal tenderness on examination, and Dr. Gabbita diagnosed uncontrolled diabetes mellitus, morbid obesity and hyperlipidemia (A.R. 304).  Plaintiff returned in September and October of 2010 for test results, and Dr. Gabbita then diagnosed neuropathy and cardiomyopathy (A.R. 302-03).  When Plaintiff returned in December of 2010, she reported "lots of family problems" and complained of anxiety and an inability to work (A.R. 301).  Dr. Gabbita then diagnosed depression and anxiety, referred Plaintiff for a psychiatry consultation, prescribed Ativan and ordered Plaintiff off work for four days (A.R. 301).  Plaintiff returned in May of 2011 for a diabetic checkup, reporting that she had seen a psychiatrist (A.R. 300).  When Plaintiff returned in June of 2011, she reportedly was not taking her medication properly and was "eating everything" (A.R. 299).[1]  Dr. Gabbita noted that Plaintiff's diabetes was uncontrolled (A.R. 299).  Plaintiff returned later in June of 2011, reporting that she had been to the emergency room for pain in her left leg and complaining of anxiety (A.R. 298).  Dr. Gabbita prescribed Xanax (A.R. 298).

Cardiologist Dr. Sudhaker Nayak treated Plaintiff while she was hospitalized for septic shock in August of 2011 (A.R. 249-68).  Plaintiff was "well known" to Dr. Nayak because of her history of

---

[1]    Tests from May of 2011 showed, _inter alia_, high triglycerides (1877 mg/dL, where the reference range is < 150 mg/dL), high glucose (343 mg/dL, where the reference range is 65-99 mg/dL), and high hemoglobin A1C (12.4, where the reference range is < 5.7 percent of total Hgb) (A.R. 315-17).

previous congestive cardiac failure and postpartum cardiomyopathy (A.R. 266; see A.R. 251 (September, 2010 treatment note for cardiac management, with reported fatigue, "DOE" (dyspnea on exertion), nonexertional "CP" (chest pain), and obesity)). Plaintiff reportedly had been at work when she started having lightheadedness, chills, nausea, vomiting and diarrhea, so she presented to the emergency room (A.R. 266). Plaintiff had low blood pressure and tachycardia and her diabetes apparently was out of control (A.R. 264, 266). Plaintiff, who was 37 years old at the time, reported that her mother had coronary artery disease and that her father had died of heart disease at age 39 (A.R. 266). Plaintiff followed up with Dr. Nayak for cardiac management later in August of 2011, reporting chest pain, palpitations, "SOB" (shortness of breath), DOE, fatigue and "GERD" (gastroesophageal reflux disease) (A.R. 249-50).

Meanwhile, Plaintiff returned to Dr. Gabbita on August 10, 2011, reporting that she had been to the emergency room for septic shock, and complaining of a bump on her upper back for two weeks with numbness in the right arm (A.R. 297).[2] Plaintiff returned in or around September of 2011, reporting that she had flank pain for six days but then was "ok" (A.R. 296). Her diabetes reportedly was uncontrolled (A.R. 296). Plaintiff returned in October of 2011,

///

///

///

---

[2]     Tests from August of 2011 showed, inter alia, high triglycerides (1221 mg/dL), high glucose (323 mg/dL), and high hemoglobin A1C (12.0) (A.R. 311-13).

complaining of muscle spasms and that she felt "tilted" (A.R. 295).[3]
Her diabetes again was characterized as uncontrolled (A.R. 295). Dr.
Gabbita referred Plaintiff for a neurology consultation (A.R. 295).
Plaintiff returned in January of 2012, and was assessed with an
adrenal tumor per imaging (A.R. 293-94). When Plaintiff returned in
March of 2012, she reportedly requested "permanent disability" (A.R.
292). Plaintiff returned in May of 2012, requesting a Xanax refill
and reporting the she was unable to work (A.R. 291).[4] Plaintiff
returned in June of 2012, reporting that she again was "eating
everything" and her diabetes still was uncontrolled (A.R. 290). There
are no additional follow up treatment records from Dr. Gabbita.

Per Dr. Gabbita's referral, Neurologist Dr. Paul Helfgott treated
Plaintiff from November of 2011 through February of 2012 (A.R. 270-
80). Plaintiff presented in November of 2011, complaining of muscle
tenderness and spasms in her neck, low back pain radiating into the
right leg, numbness and tingling in her feet, numbness in her right
forearm, neck pain, arm pain, shortness of breath on exertion, ankle
swelling, joint and muscle pain, weakness, dizziness, sensitivity to
touch and depression (A.R. 278). Plaintiff then was living with her
family and receiving disability (A.R. 278). On examination, Plaintiff
reportedly was asymmetric in a seated position, her left shoulder was
significantly raised and she had muscle spasm in the left trapezius

---

[3]     Tests from October of 2011 showed, _inter alia_, high
triglycerides (595 mg/dL,), high glucose (314 mg/dL), and high
hemoglobin A1C (11.2) (A.R. 310).

[4]     Tests from May of 2012 showed, _inter alia_, high
triglycerides (1401 mg/dL), high glucose (358 mg/dL), and high
Hemoglobin A1C (12.0) (A.R. 306-07).

muscles, a tilt in her pelvis when standing with the left side lower than the right, some loss of sensation to the hands and feet, a shortened stride, difficulty with tandem walking, and diminished reflexes (A.R. 278-80).  Dr. Helfgott diagnosed diabetes, diabetic polyneuropathy, probable lumbar radiculopathy on the right side, cervical muscle, neck and shoulder muscle spasm, hypertriglyceridemia, cardiomyopathy and depression (A.R. 279).  Dr. Helfgott ordered physical therapy and testing and prescribed Gabapentin (A.R. 278-79).[5]

Plaintiff returned to Dr. Helfgott in December of 2011, complaining of some burning sensation on the bottom of her foot and numbness in her hands that was bothersome at night (A.R. 272).  EMG and nerve conduction studies showed moderately severe bilateral carpal tunnel syndrome, moderate bilateral tarsal tunnel syndrome, and some evidence of L5-S1 chronic denervation (A.R. 272).  Dr. Helfgott assessed bilateral carpal tunnel syndrome, bilateral tarsal tunnel syndrome, L5-S1 radiculopathy and diabetes (A.R. 272).  Dr. Helfgott prescribed wrist splints to be worn at night and also ordered a lumber spine MRI (id.).

Plaintiff returned to Dr. Helfgott in February of 2012, complaining of numbness in her hands, but reporting that wearing wrist

_____

[5]     There are progress notes for physical therapy from November 30, 2011 through January 4, 2012 (A.R. 464-86). Plaintiff reportedly had a mild antalgic gait (A.R. 480).  The physical therapist opined that Plaintiff had no radiculopathy and that her pain in her right leg was the result of intermittent muscle spasms (A.R. 464, 467).  Plaintiff was authorized to continue her physical therapy but never scheduled additional appointments (A.R. 464).

splints and taking Gabapentin helped with her discomfort (A.R. 270).
On examination, Plaintiff's gait and functioning in extremities were
normal and she reportedly had no significant muscle atrophy or edema
of the lower extremities (A.R. 270).  Dr. Helfgott noted that surgical
release might be performed if the splints are not completely
successful in addressing Plaintiff's carpal tunnel syndrome (A.R.
270).  Dr. Helfgott did not recommend any specific treatment for
Plaintiff's bilateral tarsal tunnel syndrome (A.R. 270).  Based on
recent imaging, Dr. Helfgott assessed: (1) mild and chronic bilateral
lumbosacral radiculopathy, with an 8-millimeter sequestered disc
fragment in the lumbar spine identified by MRI, which did not appear
to be causing any significant symptoms; and (2) organomegaly
(enlargement of the organs; being evaluated elsewhere) (A.R. 270).[6]
Dr. Helfgott ordered Plaintiff to continue to wear her wrist splints
at night and to take Gabapentin for discomfort (A.R. 270).  There are
no additional treatment records from Dr. Helfgott.

///

---

[6]     A January, 2012 abdominal MRI showed a left adrenal
adenoma, markedly enlarged fatty liver, marked splenomegaly,
cholelithiasis with a single tiny gallstone, bilateral renal
enlargement, a benign breast mass, and an 8-mm sequestered disc
fragment posterior to the T12 vertebral body (A.R. 281-82; see
also A.R. 462-63 (January, 2012 mammogram showing benign mass)).
A January, 2012 MRI of the lumbar spine showed the sequestered
disc fragment at T12-L1, mild facet arthropathy at L3-L4,
advanced degenerative disc disease at L4-L5, small diffuse disc
bulge at L4-L5 with no central canal stenosis, mild biforaminal
narrowing, mild facet arthropathy at L5-S1, and the adrenal gland
mass (A.R. 283-84; see also A.R. 286-87 (December, 2011 lumbar
spine MRI also showing the disc fragment at T12 and moderate
central disc extrusion and moderate degenerative disc disease at
L4-L5); A.R. 504 (August, 2011 abdominal CT scan showing
disproportionate disc space narrowing at L4-L5 which was evidence
of degenerative disc disease)).

There are records from Presbyterian Intercommunity Hospital for an emergency room visit on September 14, 2012 (A.R. 344-90). Plaintiff complained of sharp, constant left back pain and flank pain for a few days, made worse with movement (A.R. 345, 353). On examination, Plaintiff exhibited tenderness in the left and right paralumbar area, but good range of motion (A.R. 353-54). Plaintiff was assessed with pain, probably musculoskeletal, and admitted for observation (A.R. 346). A pelvic ultrasound and MRI were unremarkable, except for complex right ovarian cysts (A.R. 351). Plaintiff's diabetes again was uncontrolled (A.R. 350-51). Plaintiff was given pain medication and discharged after 48 hours of observation, at which time her pain reportedly was controlled (A.R. 351).

Consultative examiner Dr. Ashraf Elmashat prepared a complete psychiatric evaluation dated August 30, 2012 (A.R. 325-30). Dr. Elmashat reviewed no medical records (A.R. 325). Plaintiff complained of depression, anxiety and her "physical condition" (A.R. 325). Plaintiff reported that she had been feeling stressed and depressed with decreased energy and decreased concentration due to her physical condition for many years, but she admitted she has good sleep and a good appetite (A.R. 325). Plaintiff claimed that she had been unable to go back to her job after her hospitalization for septic shock in August of 2011 (A.R. 325). Two years prior thereto, Plaintiff reportedly had been seen by a therapist for eight weeks for anxiety following an attempted suicide by Plaintiff's mother (A.R. 326). Plaintiff had been taking Zoloft for the past four years and Xanax for the past two years (A.R. 326).

Plaintiff reported that she got along well with people at work and that her relationships with family and friends were "fair" (A.R. 327). Plaintiff reportedly was living in an apartment with her husband, was receiving disability, and was able to drive, bathe and dress herself, take pictures and make cards, do some shopping, pay bills and handle cash, and go out alone, but she did not cook (A.R. 327). Plaintiff said she could help around the house and care for her three year old child on a daily basis (A.R. 327).

Mental status examination revealed a stressed mood with congruent affect, but no other abnormal findings (A.R. 327-29). Dr. Elmashat diagnosed depressive disorder (not otherwise specified) and assigned a Global Assessment of Functioning ("GAF") score of 60, with a "fair" prognosis (A.R. 329-30). See American Psychological Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 34 (4th ed. 2000).[7] Dr. Elmashat opined that Plaintiff would benefit from psychiatric care (A.R. 329). However, Dr. Elmashat also opined that Plaintiff would be able perform work related functions and did not assess any work related limitations (A.R. 329-30).

Consultative examiner Dr. Rocely Ella-Tamayo prepared an internal medicine evaluation also dated August 30, 2012 (A.R. 334-39). Dr. Ella-Tamayo reviewed medical records including MRI studies of Plaintiff's lumbar spine and evaluations for carpal and tarsal tunnel

---

[7]     A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM-IV-TR, p. 34.

syndrome (A.R. 334-35).  Plaintiff complained of diabetes mellitus, obesity, occasional headaches, angina pectoris (chest pain), occasional ankle swelling, high blood pressure, a heart condition (postpartum cardiomyopathy), shortness of breath, and low back pain for the past 10 months relieved by stretching and changing positions (A.R. 334-35).  Plaintiff reportedly could pick up 20 pounds and walk two blocks slowly (A.R. 335).  Plaintiff reportedly drove locally, handled her own personal care, helped with light cleaning, and went to the doctor and sometimes to the store (A.R. 335).  On examination, Plaintiff was obese but in no acute distress, with a normal gait, normal ranges of motion, and no noted abnormalities (A.R. 337-38).  Dr. Ella-Tamayo diagnosed insulin dependent diabetes mellitus, hypertension, a history of congestive cardiomyopathy, a history of back pain and obesity (A.R. 338-39).  Dr. Ella-Tamayo opined that Plaintiff could perform light work with frequent kneeling and squatting (A.R. 339).

    In September of 2012 and April of 2013, state agency physicians reviewed the record (including the consultative examiners' evaluations), and agreed with the functional capacities the examiners found to exist.  See A.R. 59-81 (initial and reconsideration disability determinations).

    There is a gap in the treatment records between September of 2012 and June of 2015, which Plaintiff attributed to being homeless and depressed (A.R. 48-49).  In an "Exertion Questionnaire" dated September 7, 2012, Plaintiff reported that she had been evicted in July of 2012 and had been living with friends, family and in motels

(A.R. 193-96).  In a "Disability Report - Appeal" form submitted in November of 2012, Plaintiff reported that she had difficulty finding psychiatric care because she was homeless with limited financial resources (A.R. 201).

Plaintiff treated with Dr. Jason Jilk from June through September of 2015 (A.R. 417-55).  Plaintiff presented in June of 2015, for medication refills and was then looking for a new doctor (A.R. 432).  Plaintiff admittedly had not been taking good care of her health in the past year (A.R. 432).  Plaintiff was not checking her blood sugar at home and had no diabetic supplies (A.R. 432).  Plaintiff complained of peripheral neuropathy, numbness in the toes and feet, leg cramps, dypsnea after walking 100 feet or climbing one flight of stairs, chest pain, anxiety and depression, and dry eyes (A.R. 432).  Plaintiff was taking Sertraline for her depression, which was not effective, and had just begun seeking mental health treatment from the county (A.R. 432).  On examination, Plaintiff was depressed and had a blunt affect but no other noted abnormal findings (A.R. 433).  Plaintiff was assessed with diabetic neuropathy, anxiety and depression, dry eyes, cardiomyopathy, congestive heart failure, hypertriglyceridemia, chest pain and uncontrolled diabetes mellitus (A.R. 433-34).  Dr. Jilk prescribed medications and ordered testing (A.R. 434).

Plaintiff returned to Dr. Jilk later in June of 2015 (A.R. 427-30).  Plaintiff reported that her peripheral neuropathy had improved through increasing the Gabapentin dosage (A.R. 427).  Plaintiff's Sertraline also had been increased, but she felt it was not controlling her anxiety or depression "well" (A.R. 427).  Plaintiff's

examination results were unchanged from the prior visit (A.R. 428).[8]

Plaintiff returned to Dr. Jilk in August of 2015 (A.R. 420-26). Plaintiff reported that her neuropathy had improved on Gabapentin, and her triglycerides apparently also had improved with medication (A.R. 420). Plaintiff's examination results were unchanged, but for noted trace pedal edema, a papular rash on her cheeks, and dysthymic mood improved from prior visits with somewhat blunted affect (A.R. 421-22). Echocardiogram testing showed left ventricular ejection fraction between 50 and 55 percent, borderline enlarged left atrium, and mildly elevated pulmonary artery systolic pressure (A.R. 423-25).[9]

Plaintiff returned to Dr. Jilk in September of 2015, reporting that her blood sugars had improved at some times, but that she was not checking them at other times and that she had an abdominal mass seen on a MRI two years earlier (A.R. 417-19). On examination, Plaintiff had no edema or rash, and had a dysthymic and blunted affect (A.R. 419). Dr. Jilk suggested a follow up MRI for Plaintiff's abdominal mass (A.R. 419). There are no additional treatment records from Dr. Jilk.

There are records from an emergency room visit to the Presbyterian Intercommunity Hospital in May of 2016, for neck pain

---

[8]     Tests from June of 2015 showed, inter alia, high triglycerides (1903 mg/dL), and high hemoglobin A1C (12.9) (A.R. 444, 449).

[9]     Tests from August of 2015 showed, inter alia, high triglycerides (529 mg/dL), and high glucose (319 mg/dL) (A.R. 437, 439).

from an assault by Plaintiff's husband (A.R. 457-60). Plaintiff had been put in a choke hold and had residual left-sided neck pain (A.R. 457). On examination, Plaintiff had tenderness in her neck, for which she was assessed with acute cervical strain (A.R. 457). Plaintiff also had hypoglycemia, as she had not taken any insulin that day (A.R. 457). A cervical spine CT exam showed degenerative change at C7-T1 and loss of the normal cervical lordosis which may have been due to muscle spasms (A.R. 460).

There are also treatment records from Dr. Alex Tran during May - September of 2016 (A.R. 526-35). Plaintiff presented initially in May of 2016 complaining of right eye pain due to an injury (A.R. 534). Plaintiff returned for a "well woman" examination later that month (A.R. 530-33). Plaintiff returned on June 2, 2016, for her testing results and apparently was homeless at that time (A.R. 528-29). Plaintiff returned in September of 2016 for diabetes follow up and apparently still was homeless (A.R. 526-27).[10] Her diagnoses included type 2 diabetes, hypertension, obesity, a history of cardiomyopathy, chronic systolic congestive heart failure, diabetic polyneuropathy, mixed hyperlipidemia, and "severe episode of recurrent major depressive disorder, with psychotic features" (A.R. 527).

///

///

---

[10] There is a Los Angeles County Housing Authority "Certificate of Disability" signed by a social worker in June of 2016, indicating that Plaintiff was eligible for assistance due to a "mental disability/emotional impairment" (A.R. 525). The social worker stated "Ms. Gomez reports mental health symptoms which create functional impairments in her overall functioning" (A.R. 525).

Dr. Carlos Morales of Alma Family Services prepared an initial psychiatric evaluation dated June 10, 2016 (A.R. 397-400). Plaintiff then reported that she was going through a divorce, living with her children (ages 6 and 15) and receiving welfare (A.R. 397). Plaintiff was seeking "help for [her] mind," reporting a history of spousal abuse, anxiety, depression and mood swings (A.R. 397). Plaintiff described mood swings and anxiety since her childhood, anger, an inability to express her emotions, difficulty interacting with others, emptiness, fear of abandonment, sadness, crying spells, stress, frustration, insomnia, lack of energy, lack of motivation, a tendency to isolate, and socioeconomic problems (divorce, looking for housing, others) (A.R. 397). Reportedly, Plaintiff was taking Buproprion (Wellbutrin) and Strattera (Zoloft) prescribed by her primary care doctor (A.R. 397). Reportedly, Plaintiff had no history of psychiatric hospitalizations and had not been treated by a psychiatrist (A.R. 397).

On mental status examination, Plaintiff appeared tearful and somewhat anxious, her affect was congruent to dysphoria and anxious, she had a "little bit" of difficulties concentrating and with her attention span, her recent and recall memory were "fair," her comparisons were somewhat concrete, and her insight, judgment and reality assessment were "fair" (A.R. 399). Dr. Morales opined that Plaintiff "has had some emotional condition and personality disorder since probably early childhood and teens" (A.R. 399). Dr. Morales diagnosed a mood disorder (not otherwise specified) and generalized anxiety disorder with borderline personality traits, problems with Plaintiff's primary support system, socioeconomic problems and housing

problems (A.R. 399).  Dr. Morales assigned a GAF of 50 (A.R. 399).[11]
Dr. Morales increased Plaintiff's Wellbutrin and discontinued her
Zoloft, adding BuSpar for anxiety, and instructed Plaintiff to follow
up in one month (A.R. 400).  There are no subsequent treatment notes
from Dr. Morales.

Plaintiff also had presented to a social worker with Alma Family
Services for a detailed assessment in April of 2016 (A.R. 401-16).
Plaintiff reportedly sought treatment because she was unable to cope
with her mental health symptoms (A.R. 401).  Plaintiff reported daily
anxiety and panic attack-like symptoms four times a week, which she
said she had since she was seven years old, which make her avoid
driving on freeways or going to appointments (A.R. 401).  Plaintiff
also reported daily depressive symptoms which cause difficulty in
completing tasks of daily living like cooking, cleaning and self care,
which emerged six months earlier following her grandfather's death
(A.R. 401, 407).  Plaintiff and her two children, who then were 14 and
six years old, were living with Plaintiff's uncle and Plaintiff was
receiving welfare (A.R. 405).  Plaintiff reported that her husband
(who is the father of her children) had not lived with her since her
oldest child was five years old (around 2007) (A.R. 405).

///

///

///

---

[11].  A GAF score of 41-50 denotes "Serious symptoms (e.g.,
suicidal ideation, severe obsessional rituals, frequent
shoplifting), OR any serious impairment in social, occupational,
or school functioning (e.g., no friends, unable to keep a job)."
DSM-IV-TR, p. 34.

## II. The ALJ Erred in Connection with the Evaluation of Plaintiff's Testimony and Statements Regarding the Severity of Her Limitations.

Where, as here, an ALJ finds that a claimant's medically determinable impairments reasonably could be expected to cause the symptoms alleged, the ALJ may not discount the claimant's testimony regarding the severity of the symptoms without making "specific, cogent" findings, supported in the record, to justify discounting such testimony. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010); Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); but see Smolen v. Chater, 80 F.3d 1273, 1282-84 (9th Cir. 1996) (indicating that ALJ must state "specific, clear and convincing" reasons to reject a claimant's testimony where there is no evidence of malingering).[12] Generalized, conclusory findings do not suffice. See Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (the ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony") (internal citations and quotations omitted);

_____

[12] In the absence of an ALJ's reliance on evidence of "malingering," most recent Ninth Circuit cases have applied the "clear and convincing" standard. See, e.g., Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015); Burrell v. Colvin, 775 F.3d 1133, 1136-37 (9th Cir. 2014); Treichler v. Commissioner, 775 F.3d 1090, 1102 (9th Cir. 2014); Ghanim v. Colvin, 763 F.3d 1154, 1163 n.9 (9th Cir. 2014); Garrison v. Colvin, 759 F.3d 995, 1014-15 & n.18 (9th Cir. 2014); see also Ballard v. Apfel, 2000 WL 1899797, at *2 n.1 (C.D. Cal. Dec. 19, 2000) (collecting earlier cases). In the present case, the ALJ's findings are insufficient under either standard, so the distinction between the two standards (if any) is academic.

Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001) (the ALJ must "specifically identify the testimony [the ALJ] finds not to be credible and must explain what evidence undermines the testimony"); Smolen v. Chater, 80 F.3d at 1284 ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."); see also Social Security Ruling 16-3p (eff. March 28, 2016).[13]

### A.   Plaintiff's Testimony and Statements

At the hearing in November of 2016, Plaintiff testified that her diabetic neuropathy results in numbness and almost constant chronic pain in her feet, which causes her to fall (A.R. 37-38).  Plaintiff testified that her carpal tunnel syndrome causes her to drop things and produces shooting pains in her hands (A.R. 38).  Plaintiff said she gets heart palpitations and has difficulty breathing due to her cardiomyopathy (A.R. 38-39).  Plaintiff said her medications cause her to have dizziness, fatigue and nausea (A.R. 42-43).

Plaintiff testified she had depression that started gradually in 1999 and became "really severe" in 2014 where she did not want to do anything, like shower or eat (A.R. 45).  Plaintiff had been in

---

[13]    Social Security Rulings ("SSRs") are binding on the Administration.  See Terry v. Sullivan, 903 F.2d 1273, 1275 n.1 (9th Cir. 1990).  SSR 16-3p superseded SSR 96-7p, but may have "implemented a change in diction rather than substance."  R.P. v. Colvin, 2016 WL 7042259, at *9 n.7 (E.D. Cal. Dec. 5, 2016); see also Treviso v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (suggesting that SSR 16-3p "makes clear what our precedent already required").

therapy, which she said was teaching her techniques to help her function (A.R. 45).  Plaintiff said that she is overwhelmed by everything and has difficulty functioning due to the stress and anxiety she feels whenever she leaves her house (A.R. 47-48).

Plaintiff testified that she was homeless for approximately six months in 2012 (A.R. 48-49).  Plaintiff said she had trouble following up with treatment during that time and thereafter due to severe depression, which she said made her not want to deal with anything (A.R. 48-49).  At the time of the hearing, which was approximately two months after Plaintiff reportedly again had been homeless, Plaintiff was living with her two children (a 15 year old son and a 7 year old daughter) (A.R. 46, 405, 526-29).  Plaintiff described her son as "independent," and said that she struggled to get her 7 year old dressed and to school on time (A.R. 46-48).  Plaintiff said she could drive her daughter the three minutes it took to get to school and could grocery shop for 10 minutes at a time, but said that she generally struggles to function (A.R. 46-48).

Plaintiff thought she could lift three to five pounds, stand for only five minutes due to balance problems and pain and weakness in her legs, but said sitting is "ok" (A.R. 44, 50).  Plaintiff said she has anxiety and panic that affect her "everywhere" she goes (A.R. 47).  Plaintiff said she has difficulty with focus and concentration and does not finish what she starts (A.R. 50).  Plaintiff also said she has trouble sleeping at night and has to take two hour-long naps each day (A.R. 51).
///

In an "Exertion Questionnaire" dated September 7, 2012, Plaintiff reported to Dr. Elmashat that she could help around the house and take care of her daughter who then was three years old (A.R. 327), Plaintiff reported that on an average day she took her medication, ate breakfast, did chores at a slow pace with sitting and resting as needed for pain, and that she could not do her chores in hot weather because it made her sick (A.R. 193). Plaintiff reportedly could walk no more than a block, climb approximately six steps before needing to rest, lift five to 10 pounds, do one or two errands for two days with rest for two days, grocery shop with her son twice a month, wipe things down at home, wash dishes in "spritz" (spurts) taking most of a day, and drive for short distance on local streets, all with lots of "sit down breaks" and daily naps (A.R. 193-96).

**B. The ALJ's Stated Reasons for Discounting Plaintiff's Subjective Statements are Legally Insufficient.**

The ALJ rejected Plaintiff's testimony and statements as "not entirely consistent with the medical evidence and other evidence in the record" because: (1) Plaintiff's activities of daily living assertedly were inconsistent with her symptoms, i.e., "[a]lthough [Plaintiff] complains of mental difficulties, she is the primary provider for two young children"; (2) the objective findings assertedly were inconsistent with Plaintiff's symptoms, e.g., Plaintiff's heart and digestive problems appear "fairly asymptomatic when not under a period of exacerbation," and her mental status examinations were "generally normal"; (3) there assertedly was "little evidence" of frequent treatment for any mental health issues or

diabetes; (4) Plaintiff's treatment assertedly was "conservative" in that she had no psychiatric hospitalizations, and no recommended surgical interventions for her carpal tunnel syndrome or obesity (A.R. 22). The ALJ's stated reasoning is legally deficient.

With regard to the first stated reason, inconsistencies between admitted activities and claimed incapacity properly may impugn the accuracy of a claimant's testimony and statements under certain circumstances. See, e.g., Thune v. Astrue, 499 Fed. App'x 701, 703 (9th Cir. 2012) (ALJ properly discredited pain allegations as contradicting claimant's testimony that she gardened, cleaned, cooked, and ran errands); Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008) (claimant's "normal activities of daily living, including cooking, house cleaning, doing laundry, and helping her husband in managing finances" was sufficient explanation for discounting claimant's testimony). However, it is difficult to reconcile certain Ninth Circuit opinions discussing when a claimant's daily activities properly may justify a discounting of the claimant's testimony and statements. Compare Stubbs-Danielson v. Astrue with Vertigan v. Halter, 260 F.3d 1044, 1049-50 (9th Cir. 2001) ("the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability"); see also Diedrich v. Berryhill, 874 F.3d 634, 642-43 (9th Cir. 2017) (daily activities of cooking, household chores, shopping and caring for a cat insufficient to discount the claimant's subjective complaints).
///

Here, the Court finds that Plaintiff's limited admitted activities of driving her daughter three minutes to school, shopping 10 minutes, and doing chores around the house at her own pace with rest breaks and naps, are not so extensive as properly to undermine Plaintiff's credibility. See Revels v. Berryhill, 874 F.3d 648, 667-68 (9th Cir. 2017) (ALJ erred in finding disparity between claimant's reported daily activities and symptom testimony where the claimant indicated she could use the bathroom, brush her teeth, wash her face, take her children to school, wash dishes, do laundry, sweep, mop, vacuum, go to doctor's appointments, visit her mother and father, cook, shop, get gas, and feed her dogs, where the ALJ failed to acknowledge the claimant's explanation consistent with her symptom testimony that she could complete only some tasks in a single day and regularly needed to take breaks).

"The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." Smolen v. Chater, 80 F.3d at 1283 n.7. The record does not reflect that Plaintiff performed activities for her two children (one of whom is a teenager) that would translate to sustained activity in a work setting on a regular and continuing basis for eight hours a day, five days a week. See id. (noting that a claimant's daily activities may detract from symptom testimony where a claimant is able to spend a substantial part of her day performing household chores or other activities transferrable to a work setting) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)); see also Kelly v. Berryhill, 732 Fed.

App'x 558, 563 (9th Cir. 2018) (finding ALJ's reasoning for rejecting claimant's statements was unsupported by the record, or stripped the record of "critical nuance," where the ALJ "heavily emphasize[d]" claimant's childcare responsibilities while omitting that the children were teenagers; the decision gave the impression that the claimant was engaged in arduous caretaking of young children where the children were actually engaged in substantial caretaking of the claimant); Trevizo v. Berryhill, 871 F.3d 664, 682 (9th Cir. 2017) (ALJ's reasoning that claimant's childcare responsibilities undermined claimant's statements was unsupported where the record contained almost no information concerning the claimant's childcare activities, and it appeared that claimant's responsibilities allowed her to rest, take naps and shower repeatedly throughout the day; "the mere fact that she cares for small children does not constitute an adequately specific conflict with her reported limitations"); Cysewski v. Astrue, 290 Fed. App'x 972, 974 (9th Cir. 2008) (fact that claimant was paid to provide 50 hours of childcare per week for her two grandchildren was not sufficient reason to discount claimant's testimony; babysitting at home does not necessarily translate to performing in the workplace).

With regard to the second stated reason, the ALJ may have mischaracterized Plaintiff's heart condition as "fairly aysymptomatic," given documentation that Plaintiff suffers from dypsnea on exertion (A.R. 249-51, 278). Moreover, an ALJ "may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citation

omitted); see Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("lack of medical evidence" can be "a factor" in rejecting credibility, but cannot "form the sole basis"). Here, because the ALJ's other stated reasons for discounting Plaintiff's testimony fail, the ALJ cannot rely on a claimed lack of medical evidence to discount Plaintiff's statements and testimony. Additionally, the ALJ would have to have made a specific finding identifying the testimony the ALJ found not credible and linking the rejected testimony to parts of the medical record supporting the rejection. See Brown-Hunter v. Colvin, 806 F.3d 487, 494 (9th Cir. 2015) (holding it was legal error for ALJ to fail to provide such a link) (citations omitted). The ALJ failed to provide the requisite linkage.

With regard to the third and fourth stated reasons, a limited course of treatment sometimes can justify the rejection of a claimant's testimony, at least where the testimony concerns physical problems. See, e.g., Burch v. Barnhart, 400 F.3d at 681 (lack of consistent treatment properly considered in discrediting claimant's back pain testimony); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (in assessing the credibility of a claimant's pain testimony, the Administration properly may consider the claimant's failure to request treatment and failure to follow treatment advice) (citing Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc)); Matthews v. Shalala, 10 F.3d 678, 679-80 (9th Cir. 1993) (permissible credibility factors in assessing pain testimony include limited treatment and minimal use of medications); see also Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (absence of treatment for back pain during half of the alleged disability period, and evidence

of only "conservative treatment" when the claimant finally sought treatment, sufficient to discount claimant's testimony).  However, the Ninth Circuit has observed that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."  Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (citations and quotations omitted); see also Garrison v. Colvin, 759 F.3d 995, 1018 n.24 (9th Cir. 2014) (quoting Nguyen); McTaggart v. Commissioner, 480 Fed. App'x 459, 461 n.2 (9th Cir. 2012) (reliance on fact that claimant rarely sought mental health counseling as a ground for adverse credibility finding deemed "erroneous in light of Nguyen v. Chater"); Etter v. Colvin, 2014 WL 2931145, at *2-3 (C.D. Cal. June 26, 2014) (finding ALJ's residual functional capacity assessment not supported by substantial evidence where ALJ gave "little" weight to the psychiatric consultative examiner's opinion and, in doing so, highlighted that the claimant had not received mental health treatment; citing, inter alia, Nguyen); accord Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) ("a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse") (internal citations and quotations omitted); Kangail v. Barnhart, 454 F.3d 627, 630 (7th Cir. 2006) ("mental illness in general . . . may prevent the sufferer from taking prescribed medications or otherwise submitting to treatment") (internal citations omitted).  The ALJ's reasoning also fails to acknowledge that Plaintiff was homeless for portions of the alleged disability period.

///

///

Defendant cites to other potential reasons for discounting Plaintiff's credibility (e.g., additional examination findings, Plaintiff's noncompliance in monitoring her glucose, an argument that Plaintiff's medication and conservative treatment effectively controlled her diabetes, carpal tunnel syndrome, and obesity, and the contrary findings of the consultative examiners and state agency physicians) (see Defendant's Motion, pp. 8-10). Because the ALJ did not specify such matters as reasons to discount Plaintiff's credibility, the Court cannot uphold the credibility determination on the basis of such matters. Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001) (the court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision").

The Court is unable to conclude that the ALJ's failure to state legally sufficient reasons for discounting Plaintiff's credibility was harmless. "[A]n ALJ's error is harmless where it is inconsequential to the ultimate non-disability determination." Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012) (citations and quotations omitted). Here, the vocational expert testified that if someone were off task 20 percent of the work day there would be no jobs the person could perform (A.R. 55). The vocational expert did not testify there are jobs performable by a person as limited as Plaintiff claims to be (A.R. 52-56).

III. **Remand for Further Administrative Proceedings is Appropriate.**

Because the circumstances of the case suggest that further administrative review could remedy the ALJ's error, remand is

appropriate.  McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2010); see Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003) ("Connett") (remand is an option where the ALJ fails to state sufficient reasons for rejecting a claimant's excess symptom testimony); but see Orn v. Astrue, 495 F.3d 625, 640 (9th Cir. 2007) (appearing, confusingly, to cite Connett for the proposition that "[w]hen an ALJ's reasons for rejecting the claimant's testimony are legally insufficient and it is clear from the record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's testimony, we remand for a calculation of benefits") (quotations omitted); see also Dominquez v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits"); Brown-Hunter v. Colvin, 806 F.3d at 495-96 (discussing the evidently narrow circumstances in which a court will order a benefits calculation rather than further proceedings); Ghanim v. Colvin, 763 F.3d 1154, 1166 (9th Cir. 2014) (remanding for further proceedings where the ALJ failed to state sufficient reasons for deeming a claimant's testimony not credible); Vasquez v. Astrue, 572 F.3d 586, 600-01 (9th Cir. 2009) (agreeing that a court need not "credit as true" improperly rejected claimant testimony where there are outstanding issues that must be resolved before a proper disability determination can be made); see generally INS v. Ventura, 537 U.S. 12, 16 (2002) (upon reversal of an administrative determination, the proper course is remand for additional agency investigation or explanation, except in rare circumstances); Treichler v. Commissioner, 775 F.3d 1090, 1101 n.5 (9th Cir. 2014) (remand for further administrative proceedings is the proper remedy "in all but the rarest

cases").

**CONCLUSION**

For all of the foregoing reasons,[14] Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.


LET JUDGMENT BE ENTERED ACCORDINGLY.


DATED: October 29, 2018.


                                    /s/
                           ─────────────────────
                           CHARLES F. EICK
                           UNITED STATES MAGISTRATE JUDGE

───────────────

[14]     The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time. "[E]valuation of the record as a whole creates serious doubt that [Plaintiff] is in fact disabled." See Garrison v. Colvin, 759 F.3d at 1021.